UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60750-CIV-ALTMAN/Hunt

**ALLEN FLOYD**, *individually,*
*and on behalf of* **K.F.**, *his minor child,*

   *Plaintiff,*

*v.*

**DEBBRA BRIDGMAN**, *et al.,*

   *Defendants.*

_____/

## ORDER

  The television in Allen Floyd's motel room wasn't working. So, he informed the front desk and went out for a walk to a local store—leaving behind K.F., his nine-month-old son; K.F.'s mother; and a mutual friend. As he was walking back, Floyd was met by two officers who asked him and his party to leave. When Floyd refused to answer some of the officers' questions, one officer seized Floyd by the arms and throat and a second snatched K.F. from Floyd's hands. Angered by these (alleged) violations of his civil rights, Floyd filed this lawsuit against the officers and the sheriff they work for (together, the "Defendants"), *see* Compl. [ECF No. 1], which the Defendants have now moved to dismiss, *see* Joint Motion to Dismiss (the "Motion") [ECF No. 11]. For the reasons set out below, that Motion—now ripe for adjudication, *see* Response [ECF No. 15]; Reply [ECF No. 17]—is **DENIED**.

## THE FACTS

  On July 25, 2017, Floyd was at the Red Roof Inn with his infant son K.F.; K.F.'s mother, Eltonisha Laquicia Clark; and Clark's friend, Johnnymae Davis Dardy. *See* Compl. ¶ 10.[1] Floyd notified the motel's front desk that the television in his room wasn't working and requested either a

_____

[1] We take these facts, as we must, from the allegations of Floyd's Complaint.

replacement television or a different room. *Id.* ¶ 11. While awaiting the motel's response, Floyd walked to a nearby convenience store. *Id.* ¶ 12. During Floyd's absence, the motel accused "Dardy of damaging the television and requested that the entire party vacate the motel room." *Id.* ¶ 13. Clark got in her car and started driving to Miami, taking K.F.'s car seat—but not K.F.—with her. *Id.* ¶ 17.

When he returned from the store, Floyd found two Broward Sheriff's Office Deputies, James Cady and Debbra Bridgman (together, the "Deputies"), standing in the motel room with K.F. and Dardy. *Id.* ¶ 14. After the Deputies told Floyd and his party to vacate the motel, *id.*, Floyd picked up K.F. and left the room with Dardy, *id.* ¶¶ 15–16. As he was standing in the motel's parking lot, though—waiting for a Lyft to take them home—Floyd remembered that he'd left his phone charger in the room. *Id.* ¶ 18. With the motel's permission, Floyd returned to his room to retrieve the charger, *id.*—only to realize, as he returned to the parking lot, that he couldn't, without K.F.'s car seat, take K.F. in the Lyft that was waiting to drive them away, *id.* ¶¶ 19–20. So, Floyd called Clark and asked her to come back to the motel with K.F.'s car seat. *Id.* ¶ 21.

Now left waiting for Clark, Floyd sat on the curb, holding K.F. *Id.* ¶ 22. At some point during this interlude, the Deputies learned that Dardy had an open warrant for her arrest. *Id.* ¶ 25; Motion at 3, 7, 10. But this waiting game began to agitate Cady who became increasingly impatient and belligerent, as the following exchange (lifted from the Complaint) makes clear:

> [By James Cady]: How long she gonna be man?
> [By Allen Floyd]: She in Miami.
> [Cady]: You got a separate room here? Get your ID for me bro.
> [Floyd]: I don't have to give you ID.
> [Cady]: Cause I'm gonna hand that child to you I want to see ID. I want to see your ID! Okay. Listen. Fine. I'm going to take her [Dardy] to jail cause she's got a warrant I'm going to call child services on this kid. Quit f***ing with me, boy!
> [Floyd]: Why are you yelling in front of my child?
> [Cady]: You hear me? Get your ID, now!
> [By Debbra Bridgman]: ID!
> [Cady]: Now!
> [Floyd]: Why you being so hostile?
> [Cady]: (Speaking to Dardy) Get your ass back in the car (Lyft). (Speaking to Floyd) Get me ID, now!

[Floyd]: Why are you being so hostile?
[Cady]: Because you're giving me shit and I'm tired of it.
[Floyd]: I'm not giving you shit.
[Cady]: Give me some ID. I want to know who this child is going with.
[Floyd]: Me. Allen Floyd. My name is Allen Floyd. You can look me up.
[Cady]: If you lie to me one time I'm taking your ass to jail.
[Floyd]: [Whereupon Floyd stands up while holding K.F.] It's my baby. It's my baby, man. I'm not lying to you, man. [Floyd turns away from Cady] Stop calling me boy, man.

Compl. ¶ 25. "Cady then physically restrained . . . Floyd with both arms, using his left hand to restrain . . . Floyd's right side while placing his right arm across . . . Floyd's chest, and using his right hand to restrain . . . Floyd by the throat." *Id.* ¶ 26. "What you doing?" Floyd asked, "I just told you my name." *Id.* ¶ 27. "I'm going to f***k [sic] you up," Cady answered—before directing Bridgman to "[t]ake the baby! Get the baby!" *Id.*

Bridgman then snatched K.F. from Floyd's arms, and Cady pushed Floyd against the Lyft. *Id.* ¶ 28. As nine-month-old K.F. began to cry, *id.* ¶ 30, Dardy, who had been sitting in the Lyft, tried to get out to help Floyd, *id.* ¶ 31. After releasing Floyd and placing Dardy back in the Lyft, Cady turned to Floyd and said: "It's going to get nasty here real quick. Come over here and talk to me." *Id.* ¶ 32. When Dardy tried (again) to emerge from the Lyft, Cady instructed Floyd to "[g]et her [Dardy] under control first. Get her under control." *Id.* ¶ 33. Once Floyd persuaded Dardy to reenter the Lyft, Cady turned to Floyd and said: "Okay. Grab your baby. Grab your baby so it stops crying. You want to talk to me like a man, come over and talk to me." *Id.* ¶ 34. Bridgman then handed K.F. back to Floyd—and, soon after, K.F. stopped crying. *Id.* ¶ 35. When Clark (finally) arrived with K.F.'s car seat, Floyd and K.F. got in the car and left. *Id.* ¶ 36.

## THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must

contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## ANALYSIS

In the Complaint—filed on behalf of Floyd and K.F.—Floyd levies nine counts against three Defendants: Cady, Bridgman, and Sheriff Gregory Tony in his official capacity. *See generally* Compl.

For ease of analysis, we divide these counts into four categories: (1) the unlawful-seizure claims against the Deputies (Counts I, II, and III); (2) a First Amendment retaliation claim against Cady (Count IV); (3) a procedural due process claim against Cady (Count V); and (4) state-law battery claims against all three Defendants (Counts VI, VII, VIII, and IX). The Defendants have moved to dismiss all nine counts. We address each category in turn.

## I.      Unlawful Seizure

Floyd's unlawful-seizure claims raise two issues: *First*, did the Deputies have probable cause (or reasonable suspicion) to seize Floyd and K.F.? *Second*, are the Deputies entitled to qualified immunity?

### A.      Probable Cause and Reasonable Suspicion

In his Complaint, Floyd alleges that the Deputies violated his (and K.F.'s[2]) Fourth Amendment right to be free from unreasonable searches and seizures. *See* Compl. ¶¶ 38–53.

---

[2]      Even though neither party questions Floyd's standing to assert K.F.'s claims, a federal court has "the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." *Fitzgerald v. Seaboard Sys. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985); *see also, e.g.*, *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359–60 (11th Cir. 2007) (explaining that standing "is a threshold jurisdictional question" and adding that courts "are obliged to consider standing *sua sponte* even if the parties have not raised the issue" (cleaned up)); *Klos v. Paulson*, 309 F. App'x 322, 323 n.1 (11th Cir. 2009) (recognizing that "standing is a jurisdictional requirement we must address *sua sponte*").

Floyd has standing to bring a § 1983 claim on behalf of his minor son. "A plaintiff will generally have standing where three criteria are met: (1) the plaintiff has experienced injury in fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) the plaintiff's harm is likely to be redressed should the court order relief." *Doe v. Kearney*, 329 F.3d 1286, 1292 (11th Cir. 2003). "Parents have a fundamental right to the custody of their children, and the deprivation of that right effects a cognizable injury." *Id.* at 1293. "The removal of [a] parent's children" may "nevertheless [be] a form of pretrial detention that will typically have ended by the time a legal challenge can be mounted. Consequently, any constitutional injury will likely be too fleeting to be redressed and hence qualifies as being capable of repetition yet evading review." *Id.* (citations omitted). In short, Floyd has standing to bring a constitutional claim on K.F.'s behalf here.

Specifically, Floyd contends that the Deputies had neither probable cause nor reasonable suspicion to seize him (or K.F.) *at any point* during their encounter. *See id.*

As a preliminary matter, the Defendants never dispute Floyd's central assertion that the acts of grabbing (and holding) Floyd by the arms and neck and of seizing K.F. from his father's arms constitute a seizure within the meaning of the Fourth Amendment. *See generally* Mot.; Reply. Nor can they. The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Of course, "[a] 'seizure' does not occur every time a police officer interacts with a citizen." *United States v. Knights*, 967 F.3d 1266, 1270 (11th Cir. 2020). "Officers are free to approach individuals on the street or in other public places and put questions to them if they are willing to listen." *Id.* (cleaned up) (citing *United States v. Drayton*, 536 U.S. 194, 200 (2002)). "In these consensual encounters, the officers need no suspicion because the Fourth Amendment is not implicated." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Once an encounter becomes an investigatory stop, however, the officers need reasonable suspicion. *See Bostick*, 501 U.S. at 434 ("So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." (cleaned up)); *see also United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) ("If the citizen's cooperation is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter,' however, then the encounter is no longer consensual, a seizure has occurred, and the citizen's Fourth Amendment rights are implicated." (citing *Drayton*, 536 U.S. at 201)).[3]

---

[3] "In *Terry v. Ohio*, the Supreme Court held that an officer does not violate the Fourth Amendment by conducting a 'brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Moore v. Pederson*, 806 F.3d 1036, 1044 (11th Cir. 2015) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). A *Terry* stop is a type of seizure under the Fourth Amendment because "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry*, 392 U.S. at 16. "The standard of 'reasonable suspicion' that is required

An investigatory stop occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Jordan*, 635 F.3d at 1185 (cleaned up) (quoting *Terry*, 392 U.S. at 19 n.16). In deciding whether an officer has restrained a citizen's liberty, courts ask whether "a reasonable person would feel free to terminate the encounter[.]" *Drayton*, 536 U.S. at 201; *see also Bostick*, 501 U.S. at 437 ("[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. . . . We have said before that the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." (cleaned up)); *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) ("[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" (cleaned up) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

We must thus disregard how Floyd (or K.F.) felt during the encounter and ask how a "reasonable" and "innocent person" would have felt. *Drayton*, 536 U.S. at 202 ("The reasonable person test, the Court explained [in *Bostick*], is objective and 'presupposes an *innocent* person.'" (emphasis in original)); *see also Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) ("The test's objective standard— looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. This 'reasonable' person standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." (citation omitted)). As the Eleventh Circuit has recently explained:

---

to justify a *Terry* stop is significantly more lenient than that of 'probable cause,' which is necessary to support a warrant." *Moore*, 806 F.3d at 1044 (citing *Wardlow*, 528 U.S. at 123).

> All the circumstances are relevant, including "whether a citizen's path is blocked or impeded"; whether the officers retained the individual's identification; "the suspect's age, education and intelligence; the length of the . . . detention and questioning; the number of police officers present"; whether the officers displayed their weapons; "any physical touching of the suspect[;] and the language and tone of voice of the police."

*Knights*, 967 F.3d at 1270 (quoting *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (citation omitted)).

By any of these tests, the Deputies seized Floyd when they demanded his ID and forcibly restrained him by the arms and throat—just as they unquestionably seized K.F. when they snatched him, crying, from his father's arms. The question, then, is whether they had probable cause or reasonable suspicion to do so. Unfortunately, the Defendants aren't super clear on which of these two tests applies. On page 5 of their Motion, for instance, the Defendants contend that the "Deputies had probable cause to believe that Floyd and his counterparts had committed a crime on the hotel premises and the stop and investigation were objectively reasonable under the circumstances." Mot. at 5. Later on that same page, though, they argue that, "during this questioning, which constituted a *Terry* stop or reasonable suspicion inquiry, the Deputies were permitted to ask for identification," and (they say) "Floyd's refusal to provide it was improper." *Id.* at 5–6.[4] No big deal: We'll read these sentences together—confusing though they are—as reflecting the Defendants' belief that they had *both* reasonable suspicion *and* probable cause to seize Floyd. This, however, only begs the next question: On what evidence was this suspicion (or cause) based? The Defendants' answer is simple and (ultimately) wrong: we had cause and suspicion to seize Floyd, they say, because we knew that *Dardy* had an open warrant. *See* Mot. at 7 ("[O]nce it became clear that Dardy had a warrant [out] for her

---

[4] In their Reply, the Defendants wisely appear to abandon their prior position—espoused repeatedly in their Motion, *see* Mot. at 5, 7, 10, 14—that they had probable cause to seize Floyd, *see* Reply at 3 ("Even viewing the facts as set forth by the Plaintiff, the totality of the circumstances in this case show that the brief detention and questioning was entirely reasonable, and did not evolve into an arrest for which probable cause must be shown."); *see generally id.* (never justifying the seizure with probable cause).

arrest, the Deputies were further justified in seeking identification from Floyd[.]"). But this is plainly not the law.

"[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search [and seize] that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (citing *Sibron v. New York*, 392 U.S. 40, 62–63 (1968)). "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause *particularized with respect to that person*." *Id.* (emphasis added). As the Eleventh Circuit has explained, "[p]robable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that *the suspect* had committed or was committing a crime." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (emphasis added & cleaned up) (quoting *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam)); *see also Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (warning that "relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949))). The Fourth Amendment's requirement that officers show particularized facts regarding *each* individual they intend to search or seize "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Ybarra*, 444 U.S. at 91. Even when the standard is reasonable suspicion, "officers must have a particularized and objective basis for suspecting *the particular person* stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (emphasis added). Whether the Defendants are proceeding with probable cause or reasonable suspicion, in short, they may not impute to Floyd their reasons for seizing Dardy. Nor have the Defendants cited *a single case* for their view that Floyd's mere association with Dardy justified this (otherwise illegal) imputation.

Without this imputation, the Defendants are left scrambling. The motel summoned us, they say, "because of criminal mischief or vandalism"—presumably, some allegation regarding the broken TV. Mot. at 7. But this summons appears nowhere in the Complaint. *See generally* Complaint. And the Court isn't free, at this stage of the case, to credit the Deputies' extrinsic factual averments over the well-pled allegations of the Complaint. *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 ("When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" (quoting *GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993))); *see also Devongoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018) ("On a motion to dismiss, the factual allegations in the complaint are taken as true, even if they are subject to dispute." (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993))); *Dusek*, 832 F.3d at 1246 ("The motion [to dismiss] is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)). Even if the Complaint had included such an allegation, though, it's not clear how it would help the Defendants. Floyd, after all, wasn't in the room when the police were called. *See* Compl. ¶¶ 10–14. And so, even if Dardy or Clark had damaged the TV—again, there's just no evidence for any of this—that damage would *arguably* support reasonable suspicion only as to *them*, not Floyd. *See Cortez*, 449 U.S. at 417–18 ("[T]he detaining officers must have a particularized and objective basis for suspecting the *particular* person stopped of criminal activity." (emphasis added)).[5]

It's true, of course, that the Deputies were free to probe Floyd with questions and ask for his ID—at least while the encounter was consensual. *See Bostick*, 501 U.S. at 434–35 ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that

_____

[5] The Complaint's allegations, in fact, suggest that the motel had no issue with Floyd. Management, after all, allowed him to return to his room to retrieve his phone charger. *See* Compl. ¶ 18.

individual" and "ask to examine the individual's identification"—but only "as long as the police do not convey a message that compliance with their requests is required" (cleaned up)). It's equally true, though (as the last half of the previous parenthetical implies), that Floyd was fully within his rights to decline to answer those questions and to refuse to turn over his ID—again, so long as the encounter was consensual. *See Moore*, 806 F.3d at 1045 ("Because [the arresting officer] Pederson did not have a warrant and he was not conducting a lawful *Terry* stop when Moore was inside his home, Moore was free to decide not to answer Pederson's questions."). The Defendants are thus mistaken when, in their last-ditch effort to salvage the seizure, they contend that Floyd's refusal to turn over his ID "gave rise to a reasonable suspicion that Floyd was resisting an officer without violence in violation of Florida Statute 806.13." Mot. at 8. Put somewhat differently, Floyd's lawful decision to decline Cady's request for ID "could not have served as a basis for . . . resisting an officer without violence[.]" *Moore*, 806 F.3d at 1045. And so, by "convey[ing] [the] message that compliance with their requests [was] required"—and by seizing Floyd and K.F. when Floyd refused to comply with those demands—the Deputies violated Floyd and K.F.'s rights. *Bostick*, 501 U.S. at 435.[6]

## B.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v.  City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The defense of qualified immunity "balances two important interests—the need to hold public officials accountable

---

[6] Of course, the Court takes no position on whether any of this occurred—or, if it did occur, whether it occurred in the way Floyd describes. In resolving a motion to dismiss, the Court "must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek*, 832 F.3d at 1245.

when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To qualify, "an official must first establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266–67 (11th Cir. 2004) (noting that, to qualify for the immunity, officials must be "exercising powers that legitimately form a part of their jobs"). To satisfy this first step, an officer must show that his actions were "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). If he does so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To overcome the qualified-immunity defense, a plaintiff must show that the official deprived him of a constitutional right that was "clearly established" at the time of the alleged offense. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). But, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*[7] This requirement "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206. For purposes of qualified immunity in this District, only decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court constitute "clearly established" law. *See*

---

[7] *But see Pearson*, 555 U.S. 223, 236–42 (explaining that "the *Saucier* protocol should not be regarded as mandatory in all cases," and adding that "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case"); *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (noting that the Court "altered [*Saucier*'s] rigid framework in *Pearson*, declaring that *Saucier*'s procedure should not be regarded as an inflexible requirement" (cleaned up)).

*McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) ("We have held that decisions of the United States Supreme Court, the United States Courts of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law.").

There is one nuance to the "clearly established" law requirement that's worth remembering: When "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," the official does not receive the benefit of qualified immunity. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent." (cleaned up)). This is because "[t]he easiest cases don't even arise." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citation omitted); *see also, e.g., Williams v. United States*, 341 U.S. 97, 101–02 (1951) (noting that, "when officers wring confessions from the accused by force and violence," it "is as plain as a pikestaff that the present confessions would not be allowed in evidence whatever the school of thought concerning the scope and meaning of the Due Process Clause"). "There has never been," for instance, "a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages[.]" *Lanier*, 520 U.S. at 271 (cleaned up).

To meet this corollary to the "clearly established law" doctrine—or, put another way, to show that the unconstitutionality of the official's conduct was "readily apparent"—a plaintiff must demonstrate that the official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Mattox*, 127 F.3d at 1419. As the Eleventh Circuit has made clear, however, this corollary applies only where "every reasonable officer in [the official's] position [would] conclude the force was

unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).

### 1. Discretionary Function

Floyd concedes that the Defendants were engaged in a discretionary function. *See* Resp. at 4 n.2 ("Plaintiffs agree Cady and Bridgman were performing a 'discretionary function' at the time of the incident and may raise the defense of qualified immunity."). Nor could he reasonably suggest otherwise. The Deputies, after all, were performing their duties as police officers—responding to a call, asking questions, and seizing suspects. To circumvent qualified immunity, then, Floyd must establish that the Deputies' conduct violated "clearly established" law. *See Saucier*, 533 U.S. at 208 ("The question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards.").

### 2. Clearly Established Law

"Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply." *Artiga v. Garcia*, 316 F. App'x 847, 848 (11th Cir. 2008); *see also, e.g.*, *Lee*, 284 F.3d at 1194 ("Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."). To meet his burden, Floyd must establish that the constitutional right the Deputies violated was clearly established. *See Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) ("[T]he burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.'"); *see also Saucier*, 533 U.S. at 201 (noting that a "court required to rule upon the qualified immunity issue must consider" whether "the facts alleged show the officer's conduct violated a constitutional right" and "whether the right was clearly established"); *Echols v. Lawton*, 913 F.3d 1313, 1323 (11th Cir. 2019) ("To defeat [an official's] qualified immunity, [the plaintiff] must also prove that [the official] violated a constitutional

right that 'was clearly established at the time of the challenged conduct.'" (cleaned up) (quoting *Plumhoff*, 572 U.S. at 774)).

In looking for law that's clearly established, we needn't wait for a case that's "on all fours with the instant case." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1185 (11th Cir. 2009). "Prior cases clearly establishing the constitutional violation . . . need not be 'materially similar' to the present circumstances so long as the right is 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

When the Deputies seized Floyd and snatched K.F. from his hands, the following propositions were clearly established: *one*, before seizing a suspect, an officer must have reasonable, particularized suspicion *with respect to that suspect*, *see Cortez*, 449 U.S. at 417–18 (explaining that, when the standard is reasonable suspicion, "officers must have a particularized and objective basis for suspecting *the particular person* stopped of criminal activity" (emphasis added)); *two*, an officer may not impute reasonable suspicion or probable cause from one person onto another, *see Ybarra*, 444 U.S. at 91 ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search [and seize] that person."); *three*, in a consensual encounter, officers may not "convey a message that compliance with their requests is required," *Bostick*, 501 U.S. at 434–35; and *four*, a person's refusal, during a consensual encounter, to answer questions or to show ID doesn't give rise to probable cause or reasonable suspicion, *see Moore*, 806 F.3d at 1044–45 (holding that, because "Pederson did not have a warrant and he was not conducting a lawful *Terry* stop when Moore was inside his home, Moore was free to decide not to answer Pederson's questions").

Given these "clearly established" principles, the Defendants' request for qualified immunity— and their Motion to Dismiss Counts I, II, and III—is therefore **DENIED**.

## II.        First Amendment Retaliation

In Count IV, Floyd alleges that Cady seized him and snatched K.F. from his arms in retaliation for Floyd's refusal to answer the officers' questions—a retaliation that (Floyd says) violated the First Amendment. *See* Compl. ¶¶ 58–61. In their Motion, the Defendants advance only a single argument against this count: they insist that, because "the Deputies had probable cause to suspect that a crime had been committed"—based on the "warrant for [Dardy's] arrest, and that Floyd would be leaving with the minor child"—Floyd "did not have the 'right' to refuse to show his identification." Mot. at 10. Notably, the Defendants never contend that, in the absence of probable cause or reasonable suspicion, Floyd's refusal to provide his identification would *still* constitute unprotected speech. *See generally* Mot. They've thus waived any such argument. *See Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."). And (as we're about to see) that's really the end of the matter— at least with respect to this part of the Motion.

"'As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To prevail on a retaliation claim, a plaintiff must establish three elements: *First*, "that his speech or act was constitutionally protected; *second*, that the defendant's retaliatory conduct adversely affected the protected speech; and *third*, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005) (emphasis added).

Starting with the first element, we've already determined (q.v. Section I) that Floyd had every right to refuse to hand over his ID. And the right to voice that refusal is plainly protected by the First Amendment. *See City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals

verbally to oppose or challenge police action without thereby risking arrest [or seizure] is one of the principal characteristics by which we distinguish a free nation from a police state.").

As to the second element, "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F. 3d at 1255; *see also id.* at 1250–51 (collecting cases). When Floyd refused to give over his ID—by saying things like "I don't have to give you ID"—Cady threatened to call child services to take K.F. away, *see* Compl. ¶ 25 ("I'm going to call child services on this kid."); belittled Floyd, *see id.* ("Quit f***ing with me, boy!"); threatened him with arrest, *see id.* ("If you lie to me one time I'm taking your ass to jail."); and seized him by the arms and throat and had Bridgman snatch K.F. from his arms, *id.* ¶¶ 26–28.

In these circumstances, it'd be hard to argue that "the defendant's retaliatory conduct" didn't "adversely affect[] the protected speech," *Bennett*, 423 F.3d at 1250, which we define as conduct that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights," *id.* at 1255. Remember, on a motion to dismiss, the plaintiff need only "state a claim to relief that is *plausible* on its face." *Twombly*, 550 U.S. at 570 (emphasis added). Nor, as we've explained, do the Defendants ever suggest otherwise. *See generally* Compl.

The Defendants' Motion fares no better on the third *Bennett* element. After all, given the sequence of events—and, specifically, the immediacy of the Deputies' response to Floyd's expression of protected speech—the Deputies can't really deny that there appears to be "a causal connection between the retaliatory actions and the adverse effect on speech," *Bennett*, 423 F.3d at 1250. In any event (again), the Defendants never disclaim any such connection. *See generally* Compl.

The Defendants' Motion to Dismiss Count IV is, therefore, **DENIED**.

### III.  Due Process

Floyd's procedural due process claim (Count V) also survives. A procedural due process claim generally has three elements:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 321 (1976). Under the Fourteenth Amendment, "parents have a constitutionally protected liberty interest in the care, custody and management of their children." *Doe v. Kearney*, 329 F.3d 1286, 1293 (11th Cir. 2003). In Count V, Floyd contends that the Deputies violated his constitutional right to procedural due process when, absent probable cause, they removed K.F. from his custody. *See* Compl. ¶ 68.

Our facts come nowhere near the degree of deprivation the Eleventh Circuit faced in *Kearney*— the only case Floyd cites for this claim. *See* Resp. at 18. In *Kearney*, an authorized agent of Florida's Department of Children and Family Services ("DCF") removed, without process, the plaintiffs' three children from their home. *See* 329 F.3d at 1291. Here, by contrast, we have only a (very) momentary deprivation.[8] But, again, the Defendants offer us nothing in the way of new argument. They don't, for instance, contend that the momentary seizure doesn't constitute a deprivation for purposes of the Fourteenth Amendment; they don't argue that they provided Floyd with whatever process was due him in the circumstances; and they never address the balancing of governmental and private interests that's been a hallmark of procedural due process claims since *Matthews*. *See generally* Mot.; Reply.[9]

---

[8] The Complaint isn't clear on how long K.F. was in Bridgman's arms. *See* Compl. ¶¶ 28–35. But, given the fast-evolving series of events, it doesn't appear to have been for more than a minute or so.

[9] They've thus waived any such arguments. *See (again) Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived.").

Instead, they simply rehash the same-old tired claim that the deprivation was justified by probable cause. *See* Mot. at 11. Since we've already determined that the Deputies had no such probable cause (or reasonable suspicion), this argument gets them exactly nowhere.

The Defendants' Motion to Dismiss Count V, in sum, is **DENIED**.

## IV.     Battery

Finally, Floyd levies state-law battery claims against all three Defendants—two against Cady and Bridgman (Counts VII & IX) and two against Sheriff Tony (Counts VI & VIII). *See* Compl. ¶¶ 71–90.

### A.  The Deputies (Counts VII & IX)

The Eleventh Circuit has counseled district courts to "look to state law to determine the scope of a state official's discretionary authority." *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 2746 (2019). "In order to establish a claim of battery under Florida law, the following elements must be proven: (1) the intent to cause a harmful or offensive contact with another person; and (2) an offensive contact that directly or indirectly results." *Brown v. J.C. Penney Corp., Inc.*, 521 F. App'x 922, 923 (11th Cir. 2013) (citing *Chorak v. Naughton*, 409 So. 2d 35, 39 (Fla. 2d DCA 1981)).

The Complaint adequately alleges both elements. When Floyd didn't comply with Cady's demand, "Cady [] physically restrained . . . Floyd with both arms, using his left hand to restrain . . . Floyd's right side while placing his right arm across . . . Floyd's chest, and using his right hand to restrain . . . Floyd by the throat." Compl. ¶ 26. As he did so, Cady barked: "I'm going to f***k [sic] you up[.]" *Id.* ¶ 27. It's hard to argue that these allegations don't establish "(1) the intent to cause a harmful or offensive contact with another person," or "(2) an offensive contact that directly or indirectly results."

19

Trying to parry this conclusion, the Defendants offer two arguments—both unpersuasive. *First*, again, the Defendants claim that the seizure was lawful because the Deputies had either probable cause or reasonable suspicion. *See* Mot. at 14; Reply at 10. We've already rejected this argument and do so again here.

*Second*, the Defendants ask the Court to dismiss the battery claims *against the Deputies* because (they say) the Deputies didn't "act[] outside the scope of their employment or in bad faith." Mot. at 15 (cleaned up). Under Florida law, "[n]o officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort . . . *unless* such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." FLA. STAT. § 768.28(9)(a) (emphasis added). Florida law thus recognizes the *intentional* tort of battery by a police officer. *See City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) ("If excessive forced is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery."). The Deputies may be right that they neither "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." FLA. STAT. § 768.28(9)(a). But questions about what the Deputies were thinking, what they intended, and whether they acted willfully or in good faith are generally questions of fact best left for summary judgment or trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *cf. Obremski v. Armor Correctional Health Services, Inc.*, 467 F. Supp. 3d 1265, 1276 (S.D. Fla. 2020) ("Dr. Frankowitz's failure to send Mr. Obremski to a hospital despite the (arguably) unambiguous warning signs he was exhibiting may have resulted from 'mere negligence' (or no negligence), to be sure. But a jury could reasonably—and just as easily—conclude that this misfeasance, such as it is, evinced something more. Wherever that line

is, it is a line that, on these facts, a jury as fact-finder—and not this Court as arbiter of legal questions—must draw after a meticulous inspection of all the evidence."). In any event, Floyd has plausibly alleged that the Deputies' conduct—in grabbing him by the throat, threatening to "f***k [sic] you up," and snatching K.F. from his arms—was willful, malicious, and in bad faith.

The Defendants' Motion to Dismiss Counts VII and IX is thus **DENIED**.

### B. Sheriff Tony (Counts VI and VIII)

In Counts VI and VIII, Floyd pleads alternative claims against Sheriff Tony. In essence, he says that, if the Deputies' conduct wasn't willful, malicious, or in bad faith, then Sheriff Tony should be liable under the doctrine of *respondeat superior. See* Compl. ¶¶ 71–75, 81–85. "Under the doctrine of respondeat superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer." *Iglesia Cristiana La Casa Del Señor, Inc. v. L.M.*, 783 So. 2d 353, 356 (Fla. 3d DCA 2001). Of course, Sheriff Tony is right when he points out that, if the Deputies had either reasonable suspicion or probable cause, then he would be entitled to judgment on Counts VI and VIII. *See* Motion at 14; Reply at 10. But we've already rejected this argument several times and now do so again here.

Of course, if the Deputies are found individually liable on Counts VII and IX—meaning that they acted *outside* the scope of their employment—then Sheriff Tony would be entitled to judgment on Counts VI and VIII. But a plaintiff may plead claims—even contradictory claims, like these ones— in the alternative. *See* Fed. R. Civ. P. 8(d)(2)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also, e.g., United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273–74 (11th Cir. 2009) ("UTC's complaint is not subject to dismissal simply because it alleges that both Mazer, individually, and West–Hem committed the tortious conduct, even if it would be impossible for both to be simultaneously liable (which question of impossibility we need not, and do not,

resolve).”). Either way, Sheriff Tony never advances this inconsistent-pleading argument, *see generally* Mot.—and so (again), he's waived it. And, since the Sheriff offers no other basis for dismissing Counts VI and VIII, *see* Mot. at 14–15; Reply at 10, his Motion is likewise **DENIED**.

***

After careful review, the Court hereby

**ORDERS AND ADJUDGES** that the Defendants' Motion to Dismiss [ECF No. 11] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 1st day of March 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record